Merrick *v.* Brainard.

MERRICK and others *vs.* BRAINARD and others.

A *carrier* can maintain an action in his own name, for an injury done to property intrusted to him to be carried; and in such action he may recover the value, which he will hold in trust for the owner.

The owners of a tow boat, undertaking to tow another boat, are, in the absence of an express contract limiting their liability, bound to exercise ordinary care and diligence, and are liable for the want thereof.

When a carrier of goods employs a tow boat to tow his vessel, and those in charge of the tow boat are guilty of negligence, whereby damage is done to the goods, and the carrier has not excepted in his contract such risks, he is liable to the owners of the goods, for such negligence, on the principle of responsibility for the acts and neglects of his agent. And this liability over to the owners will enable him to maintain an action against the proprietors of the tow boat.

Merrick *v.* Brainard.

The right of action for an injury done to goods by a person whom the carrier has employed to tow his boat containing them, may be assigned by the carrier to another.

A right of action for a tort is assignable, and in an action brought by the assignee, the assignment being, on its face, valid, the defendants have nothing to do with the question of consideration.

Although a partner cannot, ordinarily, through a sale of his interest in the partnership, introduce the purchaser into the firm as a copartner, without the consent of the other members, yet there is no law which prohibits a partner from selling out his interest in the partnership.

Where, by the partnership agreement, it is provided that the interests of the partners shall be transferable, and may be transferred at the will of each partner, and that the purchaser shall be clothed with all the rights of his vendor, a transfer of the interest of a partner will work no dissolution, and the purchaser becomes to all intents and purposes a partner; and, as between the partner selling or assigning his interest and his copartners, the former will cease to be a partner, or to be liable as such.

A foreign corporation, migrating to this state and carrying on its business here, exclusively, and ceasing to transact any business in the state of its creation, loses its corporate rights and privileges, and becomes, as to all persons dealing with it, a mere partnership.

A stockholder in such a corporation is liable as a partner, in the association or partnership which the stockholders become, on the termination of the corporation. MORGAN, J. dissented.

In an action against the owners of a tow boat, for an injury done to the goods they have undertaken to transport, through their negligence, the defendants are not entitled to claim any deduction for so much of the loss as was covered by insurance.

APPEAL from a judgment rendered at the circuit. The action was brought to recover for damages sustained by the negligence of the defendants' servants and agents in towing the canal boat Camden from New York to Albany, by means whereof said boat and her cargo were injured by being forced upon a rock, in the Hudson river. Vandewater Brothers were common carriers on the Hudson river and Erie canal, and as such were employed by the plaintiffs and others to carry certain merchandise from New York to Albany and places north and west of that city. Vandewater Brothers owned the boat Camden, and caused to be shipped thereon a large quantity of goods owned by the plaintiffs and others.

The defendant Brainard was one of the proprietors of the Albany and New York towing line of steamboats, and the defendant Van Santvoord was one of the stockholders and a director and agent of a corporation created by the state of Connecticut, called the Steam Navigation Company. This corporation had chartered and employd the tow boat Cayuga, which was owned by the association of which the defendant Brainard was agent and in which he was a partner. The Camden was taken in tow by the Cayuga under a contract to tow her to Albany, and during the voyage the loss for which the action was brought occurred.

Vandewater Brothers were indebted to the plaintiffs for moneys advanced, and to pay such advances assigned to the plaintiffs the claim against the defendants, for the injury to the Camden and the goods therein.

The cause was tried before Justice ALLEN, without a jury, at the Oswego circuit, in March, 1856. The court found the facts above stated, and that the injury to the Camden and the goods therein was caused by the negligence of those in charge of the tow boat Cayuga, and that the defendants were liable to the plaintiffs for the damages sustained by such negligence, amounting to the sum of $6846.56.

The court held, as matter of law: 1st. That Vandewater Brothers had a right of action against the defendants for the injury done to the Camden and her cargo. 2d. That such right of action was assignable. 3d. That the plaintiffs as their assignees could sue and recover. 4th. That the Steam Navigation Company having been created by the laws of Connecticut, and having transferred its whole business operations to this state, except holding meetings to elect directors, ceased to be a corporation within this state, and hence the defendant Van Santvoord, being a stockholder therein, was liable as a partner in the association or partnership which the stockholders became, on the termination of the corporation.

Merrick *v.* Brainard.

*C. Van Santvoord,* for the appellant.

*Henry A. Foster,* for the respondent.

MULLIN, J.   The importance of this case, as well by reason of the amount claimed as of the principles of law involved, makes it proper and necessary that it should receive a careful examination.

The first question presented for consideration is, whether the plaintiffs can in law maintain this action; and this involves three other questions: 1st. Whether there was any right of action in Vandewater Brothers, the assignors of the plaintiffs. 2d. Whether, if there was, it was assignable. 3d. Whether it has been assigned so as to vest any interest in the plaintiffs.

Vandewater Brothers were common carriers of merchandise between the cities of New York and Oswego, and owned the canal boat Camden.   In September, 1851, said firm contracted with an association of persons who had in their employ the tow boat Cayuga, to tow said canal boat Camden, with merchandise, from New York to Albany, for a compensation then and there agreed to be paid.   Said tow boat took the Camden in tow and started on her voyage, and during said voyage, through the carelessness, as it is alleged, of those navigating the tow boat, the Camden was thrown on the rocks in the Hudson river and sunk, whereby she and her cargo were injured.   The property on board the Camden was owned by sundry individuals, under contracts with whom Vandewater Brothers were carrying said goods at the time of the injury to said boat.

It is said in 1 *Chitty's Plead.* 48, that though at the time when the injury was committed the goods were in the actual possession of a servant, *carrier,* or other bailee, yet if the general owner had the right of immediate possession the action may be in his name, or it may be in the name of the

person having actual possession at the time of the injury but only a special property, as by a factor, a carrier, a pawnbroker and but a mere servant.

It is further insisted that the plaintiffs cannot maintain the action, because one of the assignors was a partner in one of the lines that chartered the Cayuga, and therefore liable to contribute to the loss.

It is found by the referee that Vandewater, who was a partner in the Albany and New York towing company, had sold his interest therein to Mr. Meeks before the accident in question. It then comes to this: Can a partner dispose of his interest in the partnership, and thereafter prosecute the partners for a cause of action arising subsequent to the transfer? I know of no law which prohibits a partner from selling out his interest in the partnership. He cannot, ordinarily, through such sale, introduce the purchaser into the firm as a copartner, without the consent of the other partners. But that sush a sale will transfer the interest of the partner selling, I have no doubt. In *Marquand* v. *The New York Manufacturing Co.*, (17 *John*. 525,) it was held that a *bona fide* assignment by one of several partners, of all his interest in the copartnership stock &c., *ipso facto* dissolves the partnership, notwithstanding it was provided by the articles that the partnership should continue until two of the partners should demand a dissolution. And it was further held, in that case, that the assignee of the interest of the partner is entitled to an account of the profits, and to the share of such profits of the assignor. (1 *Parssons on Contracts*, 130 *and note*, 170, 171.)

From the manner provided for the transfer of the interests of partners in the forwarding lines that chartered the steamer Cayuga, it is quite clear that the interest of the persons forming such associations should be transferable, and might be transferred at the will of the partner; and that the purchaser should be clothed with all the rights of the person from

Merrick *v.* Brainard.

whom he acquired his interest. Under such an arrangement a transfer of interest brought no dissolution, and the purchaser became to all intents and purposes a partner. As between the members of the association then, the partner who sold or assigned his interest and the other partners, the former ceased to be liable as a partner. But as between the retiring partner and third persons, dealing with the firm with knowledge that he was a partner, different consequences may arise.

The question is not here whether Vandewater may not be liable to third persons as a partner, but whether on a given day he was in fact a partner in the Albany and New York line. It being competent for him to transfer his interest, and he having done so in fact, by a valid conveyance, he was not a partner at the time of the happening of the injury for which this action is brought.

The assignor having a right of action, it was assignable. (*Hall* v. *Robinson*, 2 *Comst.* 293.) The defendants have nothing to do with the question of consideration. The assignment is, on its face, valid, and whether it was transferred for value, or was a gift to the defendants, is wholly immaterial.

The next question is, were the defendants liable to respond to the plaintiffs for the damages resulting from the injury of the vessel.

If the defendants are liable it is because they are stockholders in the Steam Navigation Company, a corporation created by the legislature of Connecticut, in 1825. And as the stockholders of that corporation are not personally liable for the debts of the corporation, the defendants are not personally responsible for the damages claimed in this case, as such *stockholders.* The ground of liability insisted upon by the plaintiffs is that inasmuch as the corporation had ceased to carry on the business in the state of Connecticut, and had removed its whole operations to this state, except the formal business of electing its officers, the corporate functions ceased,

and the stockholders became liable in this state, as *partners*, for the debts of the company.

The question then is reduced to this: Does a corporation created by another state lose its corporate rights and privileges when it ceases to transact business in the state of cre- ·ation, and carries on its business exclusively in the state to which it has removed?

It is not in the power of one government to grant rights or privileges which may be asserted or exercised, or impose duties which may be performed, within the limits of another government, without its consent. If a foreign corporation comes into this state and exercises any of its corporate func- tions, it is not by virtue of the powers conferred by its char- ter, but by the comity of this state. In the exercise of this comity, our courts are constantly engaged in the hearing of causes brought by foreign corporations, and in issuing pro- cess in their behalf against the property of other foreign corporations, and in the trial of causes in which they are defendants. These proceedings being conducted in the cor- porate name, they are an unequivocal recognition of the valid existence of such foreign corporations in this state.

If we entertain jurisdiction in cases in which foreign corpo- rations are parties, thus giving effect to the law of the gov- ernment that created them, we must in justice recognize and enforce the provisions of their charters. The rights conferred by such charters must be yielded to them, and the duties thereby imposed must be enforced against them. In other words, such corporations can exercise in this state no power not conferred by their charters. I do not mean by this that our courts or officers will assume to enforce against such corporations forfeiture of their corporate franchises which may be imposed by the charter for the abuse by such corpo- ration of such franchises. What I do mean to say is that our courts will see that the acts done by the corporation, and which form the subject matter of the action are within the powers conferred upon it by its charter, and that all the

duties imposed upon it for the benefit of those dealing with it, and the observance of which is necessary to the protection of third persons, are fully and duly performed.

But it is said that this comity does not extend or apply to a foreign corporation that has no existence in fact in the state creating it, and its existence, if at all, is within this state. According to this doctrine, the corporation may be a valid and subsisting corporation in the state in which it was chartered, and yet, because its business has been transferred to another state, it has ceased to be within the principles of comity above alluded to, and which only extend, it is said, to corporations whose business is transacted where it was brought into being.

In *Angell & Ames on Corporations*, § 104, it is said "a private corporation whose charter has been granted by one state, cannot hold meetings, pass votes and exercise powers in another state. It can have no legal existence out of the boundaries of the sovereignty by which it was created, must dwell in the place of its creation, and cannot migrate to another sovereignty."

In the *Bank of Augusta* v. *Earle*, (13 *Peters*, 588,) Chief Justice Taney says: "It is very true that a corporation can have no legal existence out of the boundaries of the sovereignty by which it was created. It exists only in contemplation of law, and by force of the law; and when that law ceases to operate and is no longer obligatory, the corporation can have no existence. It must dwell in the place of its creation, and cannot migrate to another sovereignty." The same doctrine is again asserted by the supreme court of the United States in *Runyon* v. *The Lessee of Coste*, (14 *Peters*, 122, 129.) See also *McCall* v. *Byram Manufacturing Co.*, (6 *Conn. Rep.* 428.)

In *Bard* v. *Poole*, (2 *Kern.* 495,) Denio, J. delivering the opinion of the court, says: "They (corporations) are beings existing only in contemplation of law, and have no other attributes than such as the law confers upon them;

and as the laws of a country have, in general, no extra territorial operation, a corporation cannot challenge, as a matter of right, the privilege of dealing in a country not under the jurisdiction of the sovereignty which created it."

While the foregoing cases, and others which might be cited, assert the general propositions that a corporation can have no legal existence beyond the limits of the state or country creating it, and that it must dwell in the place of its creation, and cannot migrate, yet the courts follow them up with important qualifications. In *Bard* v. *Poole*, cited supra, Judge Denio says: "But in the absence of laws of that character, (laws interdicting foreign corporations from performing certain single acts or conducting a particular description of business within its jurisdiction,) or in regard to transactions not within the purview of any prohibitory law and not inconsistent with the policy of the state as indicated by the general scope of its laws or institutions, corporations are permitted by the comity of nations to make contracts and transact business in other states than those by virtue of whose laws they were created, and to enforce those contracts, if need be, in the courts of such other states.

In the *Bank of Augusta* v. *Earle*, cited supra, Chief Justice Taney says: "But although it (the corporation) must live and have its being in that state only, [in which it was created,] yet it does not by any means follow that its existence there will not be recognized in other places, and its residence in one state creates no insuperable objection to its power of contracting in another. It is indeed a mere artificial being, invisible and intangible, yet it is a person, for certain purposes, in contemplation of law, and has been recognized as such by the decisions of this court."

When, therefore, a foreign corporation brings an action in one of our courts, we do not stop to inquire whether it has removed from the state in which it was created, or whether there is any other legal objection to the maintenance of the action, but on the principles of comity we entertain the

Merrick *v.* Brainard.

action, and leave it for the defendant to allege the reasons why the action may not be maintained. If in such case it should be established that the corporation created by the laws of Connecticut had removed its entire business to New York, we could not take away its corporate franchises. That could only be done in the state in which it was created. And that state not having so declared, we must treat it as a valid and subsisting corporation, unless the mere act of removing its business to this state is illegal and terminates, *ipso facto,* the existence of the corporation, in this state.

In none of the cases cited has any such effect as that just mentioned been alluded to as resulting from the removal into another state of the entire business of a corporation. But if a corporation created in another state can transfer to this state the whole of its business and transact the same here, under the principles of comity above alluded to, then not only is our own legislature rendered useless and unnecessary, at least so far as the creation of corporations is concerned, but all the states in the union and all the legislatures in christendom can create and let loose upon us a multitude of these corporations more destructive and pernicious than the frogs and lice let loose on the Egyptians.

It will not answer, then, to carry the doctrine of comity to this absurd extent. We have shown our respect for our sister states and for foreign governments when we have permitted corporations created by them to come into our state and make contracts and transact any other lawful branch of business, and to use our courts for the enforcement of their rights, while they remain in the place of their creation, without allowing them to become by their own act domestic corporations. Such must have been the view of Judge Denio in *Bard* v. *Poole,* (2 *Kern.* 507,) when he says: "I consider that it would be a violation of our sovereignty for a foreign corporation to remove from the country or state where it was created, to locate itself wholly in this state." The violation of our sovereignty would be a matter of very

little moment if, after it was done, our courts· would still give effect to their contracts."

It is said it is not within the province of the courts to withhold from a foreign corporation the right to the protection of its charter, so long as the legislature has not asserted its sovereignty and excluded the corporation. In other words, it is insisted that until the legislature has forbidden the courts to give effect to the rights of a foreign corporation under its charter, it is their duty to extend to them the same protection as to domestic corporations.

The courts do not take cognizance of actions by and against. foreign corporations, by virtue of any legislative enactment, but on the ground of comity; and that comity must be extended to them, under certain restrictions and limitations, until forbidden by the legislature. *Story*, in his *Conflict of Laws, page* 37, says: "In the absence of any positive rule affirming or denying or restraining the operation of foreign laws, courts of justice presume the tacit adoption of them by their own government, unless they are repugnant to its policy or prejudicial to its interests. It is not the comity of the court, but of the nation, which is administered and ascertained in the same way and guided by the same reasoning by which all other principles of the municipal law are ascertained and guided. It is for the courts, therefore, to give effect to this comity, and to form their own judgments of what the state or nation can or cannot do, and it rests solely with them to determine whether effect can be given to foreign laws without prejudice to their own national rights and interests." (*Confl. of Laws,* 33 *to* 37.)

The question then comes to this: Is it consistent with the rights and interests of the people of this state to permit foreign corporations to immigrate into this state and exercise, within it, all their corporate powers? It cannot be necessary to attempt an enumeration of the evils which would result from domesticating corporations over whose creation and conduct we can have no control. They would be with-

out limit as to number, without capital, competing with and unfairly excluding our own citizens from a share in the business of the country, or by combinations aided by aggregated wealth, not only exclude our people from a share in the business of the state, but wield a dangerous influence over our financial and commercial interests.

It seems to me that we must in self-defense declare that a corporation that thus migrates into our state loses its corporate rights, and becomes, as to all persons dealing with it, a mere partnership.

I think the learned justice was right in holding Van Santvoord to be a joint charterer of the steamer Cayuga, and liable as such for whatever injuries were done by her to the Camden.

If the defendants are liable for damages done by the Cayuga or those who were in charge of her, it remains to inquire for what acts they are thus liable, and whether, on the evidence, such liability is established.

It seems to me that this is one of those cases in which the decision of a judge or referee ought not to be disturbed, unless the finding is clearly against the evidence. There is conflicting evidence, and the judge, with the witnesses before him, and with a more perfect knowledge of the facts than we can hope to acquire from these papers, has found the defendants liable, and it is fit and proper that a finding of facts should not be disturbed. But the party is entitled to an examination by us, in order to ascertain whether his allegation that the finding is erroneous is not true; and with this view I have gone through the evidence.

One who contracts to tow a boat laden with merchandise, for another, is not a carrier, and does not assume, nor is he charged with, the duties and responsibilities of a carrier. (*Wells* v. *Steam Nav. Co.*, 2 *Comst.* 204.) In the same case, (4 *Selden*, 375,) it was held that the owners of a tow boat, in the absence of an express contract, limiting their

liability, are bound to exercise ordinary care and diligence, and are liable for the want thereof.

Such being the standard of liability, let us inquire whether there was evidence in the case which tended to charge the defendant with negligence in the navigation of the Cayuga, whereby the injury complained of occurred. The Camden, on board of which the merchandise was laden, was in good order, properly manned and equipped for the voyage. The plaintiffs' witnesses testify, in substance, that the night was a clear one; the pile of stones on which the vessel struck was well known; there was a sufficient width of channel, and depth of water, to navigate the tow; that the channel was unobstructed by vessels; and that the steamer was carried too near the west shore; and that by reason of passing beyond the proper place in the channel, the accident occurred. Upon this evidence, standing alone, it cannot be claimed that negligence is not proved.

To rebut this evidence, and excuse the misfortune, the defendants' witnesses swear that while it was clear over head, it was hazy on the shore, so as to deceive pilots as to the distance of the vessel from the shore; that there were two vessels in the channel, one at anchor below the light-house point, and the other afloat just above, and between it and the southwest point of the middle, and in the effort to escape the latter the Cayuga steered sharp to the west, and in the effort to straighten up the channel, and deceived by the haze, she was carried too near the west shore, and the injury occurred. There are two witnesses on the part of the defendants that swear to there being two vessels in the channel, that night. There are six on the part of the plaintiffs who swear that they were in a situation to see the channel, and discovered no vessels. Three or four of the defendants' witnesses swear to the existence of a fog on the shore. The plaintiffs' witnesses discovered no such thing. The effect of Nye's evidence, which doubtless had great weight in the opinion of the judge at the circuit, is attempted to be shaken

Merrick *v.* Brainard.

or done away by the oaths of two or three witnesses on the part of the defendants, who swear that in their opinion Nye could not see from the deck of his vessel how near the vessel was to the shore. But one fact is worthy of remark; that if he could not see, he guessed with astonishing accuracy. It would seem that just as he was in the act of remarking how dangerous it was for the vessel to run so close to the shore, the whistle sounded which was the evidence of the accident.

It is said that the hands on the Camden were guilty of negligence in not porting their helm, when ordered by the master of the Cayuga, just before the accident. The hands on board the Camden appear to have been men unaccustomed to the navigation of the river, and as to what duties it was necessary or proper for them to perform on board of that vessel while in tow. But if any duty was required of them to whom the safety of the vessel was intrusted, it was the duty of those on board the steamer to have informed them, and thus put upon them the responsibilities which might result from neglect. It is quite obvious that a man should be on deck of the boat in tow, during the voyage, to perform such services, and guard against such accidents, as vessels in tow are subject to or require. It appears that one man was on deck, as I understand the evidence, all the time. It further appears that no order was heard from the steamer, before the accident, requiring those on board of the Camden to do any thing in reference to that vessel. There was clearly no negligence imputable to the plaintiffs, under such circumstances.

It must be obvious to any one reading the testimony, that there was a conflict of evidence upon all the material facts in reference to the accident, and that the conclusion which the referee has drawn is the legitimate one, from the evidence.

The only remaining question to be considered, is one of damages. And in examining this, I shall confine myself to the specific objections taken by the defendants' counsel, as the question is one so peculiarly within the province of the referee

to decide that the court could not, if it would, go into a review of the whole evidence on that question.

I have already attempted to show upon authority that a carrier can maintain an action in his own name, for damages done to property intrusted to him to be carried. But the defendants say that although this may be the general rule, yet in this case the goods being the property of third persons, and as Vandewater Brothers could not sell the goods, themselves, they could not for the same reasons sell the claim for the damages arising from injury to them. If this proposition is sound, it sweeps away the doctrine which I have shown is conclusively established, that the carrier *may* sue for an injury to the goods, and in such action may recover the value, and that he holds such value in trust for the owner.

Again; so far as the right of action rests on contract, the contract is between the carrier and the charterers of the steamer, and there is no privity of contract between the owners and the charterers.

The right of action, then, being in the carrier, he has the right to assign it. No authority has been shown, nor reason given, why he may not sell or assign his claim. As carrier he has only the custody of the goods; it is a breach of duty to use or dispose of them; but when a right of action accrues by reason of interference with his possession, or of injury to the goods, the right is in law his, and he stands answerable over to the owner for the value of the goods in the one case, or the damages incurred, in the other.

It is further insisted that as to so much of the property injured in this case as belonged to owners between whom and the carriers there was an agreement exempting the latter from liability in certain cases, the plaintiffs were not entitled to recover, as the carrier was not liable over to the owners. This proposition assumes a fact not proven; to wit, that by virtue of any contract the carriers were not liable for the injury resulting from the sinking of this boat. 'I concede that if the boat was sunk by reason of the perils of the navigation

and without the fault of the carrier, then he is not liable, and in the same event the defendants are not liable to either the carriers or owners. But when a carrier employs a tow boat to tow his vessel from New York to Albany, and those in charge of the tow boat are guilty of negligence whereby damage is done to the property, and the carrier has not excepted in his contract such risks, then he is liable to the owners for such negligence. The tow boat is his agent; its acts and neglects are his; and he must bear the consequences, in obedience to the maxim *facit per alium facit per se.*

The defendants' counsel further insist that the defendants are not liable for so much of the loss sustained by the sinking of the vessel as was covered by insurance. The defendants did not insure, nor pay for insuring the property, and the question is put to them with considerable force, by what right—upon what principle—they are entitled to any benefit from such insurance.

I insure my furniture in my house; a person either willfully or negligently sets it on fire; and when I demand compensation for my loss, he insists upon his right to deduct the amount for which the property is insured. To say the least of it, the claim is wanting in modesty. But it is said that if I may retain the insurance money, and recover the value of the goods of the wrongdoer, I am the gainer by the accident. If I am, it ill becomes the wrongdoer to complain of it. If I cannot in justice retain more than the value of the property, which of the three parties concerned is entitled to the benefit of the deduction, the injured party, the wrongdoer, or the insurance company? Most clearly the latter. If I have not been paid by the insurance company before I collect of the wrongdoer, I am limited in the amount I am entitled to demand of the company to so much as will, in addition to the damages recovered, make good the loss. And if I have been already paid, the company is equitably entitled to recover so much of the damages as I have received over and above my actual loss. (37 *Eng. Ch. Rep.* 273. *Yates* v.

*Whyte,* 4 *Bing. N. C.* 272. *Bull* v. *Fritz,* 12 *How. U. S. Rep.* 466. *Hovey* v. *The Steamboat Sarah E. Brown,* decided by *Judge Betts, in MS. Clark* v. *Inhab. of Blything,* 2 *Barn. & Cress.* 254. 2 *Sand. S. C. Rep.* 496.)

After as careful an examination of this case as I have been able to bestow upon it, I am entirely satisfied that the case was properly disposed of at the circuit, upon both the facts and the law. The judgment should therefore be affirmed.

BACON and ALLEN, Justices, concurred.

MORGAN, J. (dissenting.) I concur in the general conclusions of the learned judge upon the several questions involved in this case, except the single one as to the personal liability of Abram Van Santvoord. The Steam Navigation Company was incorporated by the laws of the state of Connecticut, and was one of the *five* companies constituting the towing company, which was a voluntary association engaged in towing boats on the Hudson river between Albany and New York. Abram Van Santvoord was a stockholder of the Connecticut Steam Navigation Company, and one of its directors and agents, residing in the city of New York. The Connecticut company owned the barges known as the Swiftsure line, and this line formed part of the towing company. The principal business of the Connecticut company was done in the city of New York, by its agents residing there, except the formal election of directors. Abram Van Santvoord was not a proprietor in the towing company, except as a shareholder in the Steam Navigation Company of Connecticut. The Connecticut corporation became a proprietor of the Hudson river towing company, in its *corporate capacity,* and Abram Van Santvoord was not otherwise connected with the towing company than as a shareholder in that corporation and one of its agents residing in New York.

The charter of the Steam Navigation Company *exempts*

the stockholders from *personal* liability for the debts of the corporation.

If the corporation, therefore, was authorized and incorporated by the laws of this state instead of the laws of Connecticut, there would be no ground for making the stockholders individually liable for the damages in this action.

It is suggested by the respondents' counsel that there is evidence to show that he was a proprietor of the towing company, without reference to his stock in the Steam Navigation Company; but that fact is not found by the judge. On the contrary, the counsel of the defendants requested the judge to hold, that as a shareholder in the Steam Navigation Company, he was not liable for the demand for which this action is brought; but the judge declined to hold as requested. It is stated in the opinion of the learned judge that Van Santvoord acted as a corporation, and he is made liable on the ground that he was a stockholder in a foreign corporation, doing business here in its name. We cannot therefore sustain the judgment upon another ground now suggested for the first time in the argument, and upon which there is no finding of fact, as suggested.

Although it is stated in the opinion of the learned judge that Van Santvoord acted as a corporation, the facts as found by him in connection with the documentary evidence do not show that he signed the charter of the Cayuga on behalf of the corporation, or that he assumed to be the corporation, or that he was a party to the contract of the towing company except as one of the stockholders of a foreign corporation, and one of the agents of the corporation in the transaction of its corporate business in this state.

*The plaintiff, to maintain this action, is obliged to bring forward the Steam Navigation Company of Connecticut and show that it was one of the contracting parties. Prima facie,* that corporation is liable—for its name appears among the proprietors of the Hudson Steam Company. Mr. Van Santvoord did not put his name there, nor did he sign the

name of the Steam Navigation Company to the charter, but he was a stockholder and one of its agents in New York city. As agent alone, it is not sought to make him personally liable for the contracts of a foreign corporation, for he did not put its name to the charter. Nor is it suggested that the corporation did not authorize the contract with the Vandewaters, so far at least as a foreign corporation could authorize the transaction of business in this state.

It is admitted that if the Steam Navigation Company had remained at home, it could have made a valid contract in this state, and could sue and be sued in our courts as an artificial person. Although not expressly decided in this state, I think it is implied that, in such a case, the corporation, and not the stockholders, would be alone liable on the contract in question. (2 *Kern.* 495, 569. 20 *Wend.* 614.)

But it is claimed that this Steam Navigation Company has emigrated and taken up its abode in the city of New York, and that except the mere election of directors, its whole business is transacted here instead of Connecticut. And upon this ground the learned judge held, that by the comity of nations as administered in this state, our courts will not recognize its existence as a corporation. Judge Denio, in *Bard* v. *Poole,* (2 *Kernan* 507,) says: "I concede that it would be a violation of our sovereignty for a foreign corporation to remove from the country or state where it was created, to locate itself wholly within this state." Chief Justice Taney, in the *Bank of Augusta* v. *Earle,* (13 *Peters,* 519,) says: "It is very true that a corporation can have no legal existence out of the boundaries of the sovereignty by which it was created. It exists only in contemplation of law and by force of the law, and when that law ceases to operate and is no longer obligatory, the corporation can have no existence. It must dwell in the place of its creation and cannot emigrate to another sovereignty." In the case of *The People* v. *The Trustees of Geneva College,* (5 *Wend.* 211,) it was

decided that the corporation could exercise no powers beyond the place to which it is restricted by its charter.

Notwithstanding what is said by Judge Denio in *Bard* v. *Poole*, the court held in that case, that a foreign corporation may make and enforce within this state contracts which by its charter it is competent to enter into, and which are not forbidden by the laws or contrary to the policy of this state; and that a loan made in this state by the American Life Insurance and Trust Company, incorporated by the legislature of Maryland, and which was secured by a mortgage upon real estate in this state, was valid, and could be enforced here. The remark of Judge Denio, above quoted, was therefore a general one, without any practical illustration to give it point.

In the *Bank of Augusta* v. *Earle*, the same doctrine was declared, but the plaintiffs were permitted to sue and recover on bills of exchange in Alabama, discounted by the agents of the plaintiffs in Mobile, Alabama. The plaintiffs' bank was located at Augusta, Georgia, and incorporated by the legislature of that state. What was said in the opinion of Chief Justice Taney in that case as to the migration of a corporation from one sovereignty into another, was asserted as a general proposition, but not in a case where the rule, if admitted, could be made available.

The question in *The People* v. *The Trustees of Geneva College* arose upon a *quo warranto*, and was decided upon the express ground that the *charter restricted the location* to Geneva, and that it was a matter affecting the public at large. The judgment divested the trustees of certain corporate powers which they exercised in the city of New York, upon the ground that it was a usurpation of a franchise. It will be seen that the question was not decided, whether an individual who had made a contract with the corporation, beyond the limits of its authority, could enforce it against the corporation, or against the individual corporators, or against either.

It may be assumed that if the Steam Navigation Company 'had done any act which the laws of this state had forbidden to be done by any corporation or by any association of individuals, without express authority of law, no suit could be maintained by it founded upon such act or any obligation growing out of it, express or implied. The statutes of this state have regulated and defined the principles of international law or international comity applicable to foreign corporations attempting to enforce contracts made by them, in this state. (2 *R. S.* 457, § 2.) Can our courts go further and deny such a corporation the protection of law, merely because it has confined its principal business to this state?

If they do not engage in acts *opposed to the policy of the law or condemned by the legislature,* it would seem as if they were entitled to the protection of the courts.

If I understand the effect of the decision in this case, it virtually outlaws this corporation, not because it is engaged in an improper business, but because it confined its business to the state of New York, except the formal election of its officers. Doubtless, according to the doctrine as enunciated by the judges in some of the cases cited, this Steam Navigation Company cannot change its location to this state. This would seem, however, to be more a question of law than of fact. It cannot, says Chief Justice Taney, have a *legal existence* out of the boundaries of the sovereignty by which it is created. But by international comity in some states, *and by force of the revised statutes in this state,* the legal existence of a foreign corporation is recognized by the courts, although that existence depends upon the legislature of another state. Its contracts, when not opposed to the policy of our laws, may be enforced in this state. This Steam Navigation Company owns several barges in this state. Suppose a stranger should seize them and the navigation company should bring a suit for the wrong, in its corporate name? Could the defendant defend such a suit on the ground that the Steam Navigation Company was outlawed in this state,

because its chief business was done in the city of New York instead of Connecticut? Would this court try such a question as a question of fact in such an action? Would it even listen to the objection? If the question can be raised at all, I think it must be raised by *quo warranto*, or in a direct proceeding to test it, and that the inquiry will be by what authority the persons engaged in the business exercise the franchises of a corporation in this state. After judgment of *ouster*, and not before, could the objection be taken in a private suit between such a corporation and a person who had contracted with it in a matter not forbidden by the laws of the land. Such would certainly be the rule in respect to domestic corporations, which had forfeited their franchises. (*Slee* v. *Bloom*, 19 *John.* 456. *S. C.*, 5 *John. Ch.* 366. *Mech. Ch. Building Association* v. *Stevens*, 5 *Duer*, 676. And see *U. S. Bank* v. *Stearns*, 15 *Wend.* 315, 316, *Savage, Ch. J.; McFarlan* v. *The Triton Ins. Co.*, 4 *Denio*, 397, *Bronson, Ch. J.; Meth. Epis. Union Church* v. *Pickett*, 19 *N. Y. Rep.* 485, *Selden, J.*) In *McFarlan* v. *The Triton Ins. Co.*, above cited, Bronson, Ch. J. remarked, that it was "unnecessary to inquire what may be the rights of the people in relation to this corporation; or as against the individuals who were engaged in getting it up and setting it in motion. The defendant does not represent the sovereign power, and has nothing to do with the question whether the company should be dissolved. So long as the state does not interfere, the company may sue or do any other lawful act, whatever sins may have been committed in bringing the body into existence." Is there any difference in the principle when the corporation is created by the laws of another state? The evidence of the right of a foreign corporation to sue in our courts, is substantially the same as in case of a domestic corporation. (*U. S. Bank* v. *Stevens, above cited.*) If it misbehaves itself, so as to forfeit the protection of our laws, how is the question to be met? Here it is claimed that the Steam Navigation Company, although having a charter regu-

larly granted by the legislature of Conneticut, has abused its franchises by locating its agents in the city of New York, and transacting the principal part of its business in this state. It is admitted that it cannot emigrate into this state; but this does not necessarily imply any thing more than that it is *legally* impossible for the corporation thus to emigrate. It may do business in this state through its authorized agents residing here. This is conceded. It may then claim the protection of the courts; may sue and be sued in its corporate entity, and may enforce its contracts, when they do not contravene our laws. (*Cary* v. *Cleveland and Toledo R. R. Co.*, 29 *Barb.* 51, 52, *Allen, J.*) In these respects it stands upon as favorable ground as though it had been chartered here. Who is to determine when it has gone too far in confining its business to this state, and what should be the limit of our forbearance? I think if there is a limit beyond which it cannot go, without subjecting itself to the charge of having *emigrated* into another sovereignty, and of having exercised franchises here which cannot be tolerated by the comity or law of the state into which it has emigrated, that it is for the sovereign power to decide upon the usurpation, and not for the defendant, who is sued upon a contract which he has made with it in its corporate name.

Assuming, therefore, that a foreign corporation, as well as a domestic one, may exercise its franchises until it is dissolved, or has surrendered them, or has been deprived of them by judgment of law, and that an individual dealing with it cannot dispute its corporate existence, when sued upon his contracts made with it within the scope of its general powers, and not objectionable in other respects as against the policy of the laws authorizing it to transact business in this state, there is no sufficient ground upon which we can deny to the Steam Navigation Company the privileges and immunities which the statute gives to any other foreign corporation, doing business in this state. In *The Bank of Augusta* v. *Earle*, (13 *Peters*, 519,) the court held that

Merrick *v.* Brainard.

"whenever a corporation makes a contract, it is the contract of the legal entity, of the artificial being created by the charter, and not the contract of the individual members."

In *Ex parte Van Riper*, (20 *Wend.* 617,) Judge Cowen looked into the charter of the Manufacturers' Bank of Belleville, New Jersey, to determine the personal liability of one of the directors, and says: "No doubt a state may pass a law tying a creditor up to a certain remedy on a contract, where the law is passed prior to the contract being made. As the creditor then knew the law, he contracts *cum onere.*"

I think Van Santvoord is not, therefore, individually liable upon the contract in question, and that the learned judge erred in allowing the plaintiffs in this action to avail themselves of a principle of law, which could only be invoked on behalf of the state whose sovereignty was encroached upon by persons coming here under the protection of a charter granted to them by another state. It is not without considerable hesitation that I have arrived at this result; but in the absence of any express adjudication to the contrary, so far as I can discover, I think that a party who contracts with a foreign corporation, having a legal and valid charter in the state which grants it, stands in the same position towards it as he does towards a corporation granted by the legislature of this state. The state may, perhaps, proceed by *quo warranto*, and examine by what authority certain persons in New York city exercise the franchises of a foreign corporation within the limits of this state; and if they are violating the laws of comity by the conduct complained of in this case, the court may perhaps give judgment against them and take away their franchises, so far at least as they attempt to exercise any of them here. It may, however, be a grievance which the legislature alone can remedy.

I think the judgment should be reversed and a new trial granted, costs to abide the event.     Judgment affirmed.

[ONONDAGA GENERAL TERM, January 3, 1860. *Bacon, Allen Mullin* and *Morgan,* Justices.]