any indebtedness of Robertson not being in any wise released, or attempted to be released. This was an obligation entered into by the company at the foot of the contract, to become operative only in the event of the failure of the defendant to comply with the obligations which he had entered into, and which in no way deprived the company of any property which the defendant had a right to claim they should apply to the payment of its indebtedness to the plaintiffs.

It has recently been urged before us that the taking of additional security upon a promissory note discharged the indorser; but such a claim has not yet been recognized. It seems to us that the position of the defendant in respect to this subsequent agreement is that, because he had guarantied this debt, the plaintiffs could not agree with the company for additional security in case of his failure to fulfill his guaranty.

We think, upon the whole case, that the judgment is right, and should be affirmed, with costs. All concur.

---

### McSWEGAN et al. v. PENNSYLVANIA R. CO.

(Supreme Court, Trial Term, New York County. February, 1896.)

CARRIERS—MISDELIVERY—RATIFICATION.

> Though a carrier is not authorized to deliver goods to another than the consignee, merely because the consignee had bought them to fill an order of the other person, and intended that they should go to him, yet the carrier's act in so delivering them is ratified by the consignee treating them as the property of the other, and rightfully in his possession, writing to him for the purchase price, and agreeing to put them in proper shape.

Action by Frank McSwegan and others against the Pennsylvania Railroad Company. The complaint was dismissed, and plaintiffs move for a new trial on the minutes. Denied.

John S. Davenport, for the motion.

Robinson, Biddle & Ward, opposed.

McADAM, J. About June 7, 1893, the plaintiffs purchased from Russell & Co., of Massillon, Ohio, one steam engine and fixtures, which were delivered to the defendant by Russell & Co. for carriage and delivery to the plaintiffs at Beverly, N. J. After the shipment Russell & Co. sent the bill of lading to the plaintiffs. The goods were purchased by the plaintiffs to fill an order from the Beverly & Edgewater Park Light & Power Company (hereinafter referred to as the "Power Company"), a corporation having its place of business at Beverly, aforesaid. The plaintiffs did business at New York City, and had no office at Beverly. After the arrival of the machinery at Beverly the power company, for whom it was intended, called upon the defendant, paid the freight, and took it to their place of business, where the same was set up and put in operation. The delivery to the power company without the plaintiffs' permission constituted a conversion, and rendered the defendant liable to the plaintiffs for the value of the machinery. McEntee v. Steamboat Co., 45 N. Y. 34;

Hutch. Carr. § 344; and cases collated in 7 Abb. N. Y. Dig. 298. If the case had rested here, the plaintiffs' right to a verdict would have been clear. The plaintiffs, on discovering the true condition of things, had four courses open to them: (1) Hold the defendant in trover; (2) hold the power company in trover; (3) pursue their property, and recover its possession; (4) affirm the unauthorized act, and pursue the power company for the purchase price. The fact that the plaintiffs intended that the property should go to the power company, standing alone, gave the defendant no authority to deliver the machinery to it without the plaintiffs' permission, for they might have dictated the terms of delivery. Yet it was quite competent for the plaintiffs to assent to the delivery as made, and conclude themselves by such assent. The defendant occupied the position of carrier or transporting agent, and any act of the plaintiffs which amounts in law to a ratification of the unauthorized act as to mode of delivery absolves the defendant; for "to ratify is to give sanction and validity to something done without authority by one individual on behalf of another." Ewell, Evans, Ag. marg. p. 48. To ratify an unauthorized act performed by an agent, it is sufficient if a principal, with knowledge of what has been done by the agent, consents to be bound by it, and unequivocally manifests such intent to the other party. Keeler v. Salisbury, 33 N. Y. 648; Markham v. Washburn (Com. Pl.) 18 N. Y. Supp. 355. And ratification is equivalent to original authority: Story, Ag. § 239; Bank v. Warren, 15 N. Y. 580; Heermans v. Clarkson, 64 N. Y. 171. Or, as stated in Herman on Estoppel (section 481):

"The subsequent assent by the principal to his agent's conduct not only exonerates the agent from a consequence of a departure from his orders, but likewise renders the principal liable on contracts made in violation of such orders, or even when there has been no previous retainer or employment; and this assent may be inferred from the conduct of the principal. The subsequent sanction is considered the same thing in effect as assent at the time."

In Green v. Clark, 5 Denio, 497, a quantity of salt was received by the defendants as common carriers to be carried from Oswego to Lower Sandusky, there to be delivered in the care of William Neil & Co. The salt was delivered at Sandusky City, a port on Lake Erie, at the mouth of the Sandusky river; and Lower Sandusky, the place where by the receipt it should have been delivered, was a town on the river, about 30 miles from its mouth. The place of business of W. Neil & Co. was at Lower Sandusky, but William Neil, one of the firm, lived at Sandusky City, and had a separate establishment there, and he accepted the delivery of the salt there. The salt was left at Sandusky City on account of the difficulty in passing the bar at the mouth of the river and going up the river to Lower Sandusky. The delivery was made about the 1st of August. The owners of the salt, Richmond, Williams & Crane, were duly informed of this, and on the 3d of the succeeding October they wrote to Neil, at Sandusky City, stating that they had been informed that the salt had been left with him instead of being taken to Lower Sandusky, and directing him not to sell any part of it, as it was intended for the Messrs. Hollister, to whom an order for it would be given. The letter also desired Neil

to advise the owners without delay of the quantity of salt he had received.    An order was shown to have been given to the Hollisters as stated in the letter, but the salt was not received by them, having been disposed of by Neil some time previous to that letter having been written.    Beardsley, C. J., said:

"This letter was written with full knowledge that the defendants had violated their contract in leaving the salt at Sandusky City, and were consequently liable to the owners for its value. Everything material between the defendants and the owners was made known to them when the letter was written, although they were not then aware that the salt had been sold by Neil. That, however, was his act alone, as it does not appear to have been directed, or in any way sanctioned, by the defendants. Their violation of duty was in omitting to deliver the salt at Lower Sandusky, as they had agreed to do; and, if the owners had thought proper to stand upon their rights, the defendants would have been liable for the full value of the salt. But the owners might ratify the act, unauthorized as it was, of leaving the salt at Sandusky City, and thus waive their right of action against the defendants; and I think this letter to Neil was a complete ratification of what had been done by them. Any act of the owners, with knowledge, indicating an intention to hold on to the salt at Sandusky City as their own, and therefore wholly inconsistent with the supposition that the defendants were to be held liable for their breach of duty, amounts to a positive ratification of what had been done without authority. The subsequent ratification by the principal of an unauthorized act or omission of his agent is equivalent to a prior authorization. The maxim is, 'Omnis ratihabitio retrotrahitur, et mandato priori æquiparatur,' and the ratification completely exonerates the agent from all the consequences of his misconduct. Story, Ag. (2d Ed.) §§ 239, 243; Broom. Leg. Max. 380–383. A small matter is sufficient to establish a ratification; and the acts of the principal are to be construed liberally in favor of the agent. If what was done without authority has been adopted in any manner, even for a moment, the principal cannot recede, but is conclusively bound. Codwise v. Hacker, 1 Caines, 526; Paley, Ag. (by Dunlap) 171, 172."

While the remarks of the learned judge may perhaps be regarded as obiter, they are nevertheless forcible, and entitled to the weight due the opinion of a learned jurist.    Indeed, they apply to this case with much more cogency than to that in which they were written. There the property was never intended to reach William Neil, but was to be put in the care of a firm of which he was a member, doing business at a place far distant from Sandusky City, where he received the goods.    Here the goods were delivered to the people for whom they were intended; so that the ratification is more easily implied, and more effectually proved here than in that case.

In O'Dougherty v. Railroad Co., 1 Thomp. & C. 477, the court, citing Green v. Clark, supra, held that, although the original delivery of the goods might have been erroneous, all liability was discharged by the subsequent acquiescence of the consignee in the delivery; and upon this ground a judgment rendered in favor of the plaintiff for the misdelivery was reversed.

The ratification by the plaintiffs is not left to be inferred from their mere silence or want of disapproval; nor is it based upon one letter written by them, but on a series of letters and affirmative acts, all indicating approval of the delivery by treating the power company as the legitimate possessor and owner of the machinery, and as the debtor of the plaintiffs for the purchase price.    The plaintiffs wrote several letters to the power company demanding payment of

their bill, and stating their need of money, in one of them referring to the fact that the time on which they had purchased the machinery from Russell & Co. would soon expire, and stating that they would like the use of the power company's money before that time was up. In answer to repeated demands by the power company to repair the machinery, which had gotten out of order, the plaintiffs on one occasion wrote that they would send an expert down to repair it; and when interrogated on the stand as to what was meant by this expression one of the plaintiffs testified that he was the expert, and that he intended to go, but that his main object was to get the money. In reply to one of these requests the plaintiffs promised to send a competent man down to the power company, and put the machinery in running order at once, and when asked what this meant the only explanation was that they wished to get their money, and that they did not mean to do what they said. When questioned particularly as to whether they had not sent one Baxter to the power company to put the machinery in order, the same witness stated they had not; that Baxter belonged to Philadelphia, and was in the employ of Russell & Co.; that he had called upon plaintiffs in behalf of that concern to get the money for the machinery, and that the plaintiffs had told him that the power company had not yet paid, and they supposed that Russell & Co., doubting their word, had sent Baxter to the power company to ascertain whether what they had said was true. They said nothing to Baxter about any claim against the defendant, but referred exclusively to the power company as their debtors and paymasters. On August 1, 1893, the plaintiffs sent a postal card to the power company in which they said:

"We received to-night a telegram, saying expert will be in Beverly some time to-morrow. He will adjust the engine so that everything will be satisfactory."

If satisfactory then, ratification was complete, and, according to settled principles, irrevocable. The several demands by the power company, and the repeated promises by the plaintiffs to comply with them, were all made under the contract of purchase, and in recognition of the rights it conferred and the duties it imposed. The power company afterwards went into insolvency, and then for the first time the claim against the defendant for misdelivery was strenuously urged. The plaintiffs, having their choice of several positions, deliberately, with full knowledge of all the facts, chose to treat the delivery to the power company as authorized. This unalterably fixed their legal status. They cannot, particularly after the insolvency, and after all redress which the defendant might otherwise have been able to obtain is gone, turn round, and hold the railroad company on a cause of action in which it might have saved itself from loss if the plaintiffs had acted promptly. Merrick v. Brainard, 38 Barb. 574. It is not technically a question of election of remedies that is involved, but a choice of rights which, once asserted, disables the party from afterwards maintaining a position inconsistent with the one selected. As is said by Herman in his work on Estoppel (page 462):

"When it becomes necessary to choose between inconsistent rights and remedies, the election will be final, and cannot be reconsidered, even where no injury has been done by the choice, or would result from setting it aside."

And Story lays down the rule that:

"If the principal subsequently ratifies the act, he is bound by it, whether it be for his detriment or for his advantage, and whether it be founded upon a tort or upon a contract. And a ratification once deliberately made, with a full knowledge of all the material circumstances, cannot be recalled." Story, Ag. 242.

It is upon this ground that the plaintiffs are unable to maintain their position in this action.

For these reasons the nonsuit was proper, and the motion for a new trial must be denied.